J-A30023-15, J-A30024-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SHELDON HANNIBAL, | |
| Appellant | No. 3279 EDA 2014 |

Appeal from the Judgment of Sentence July 7, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006319-2013

_____

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM QUATTLEBAUM, | |
| Appellant | No. 3116 EDA 2014 |

Appeal from the Judgment of Sentence July 7, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006318-2013

BEFORE:  MUNDY, J., JENKINS, J., and FITZGERALD, J.[*]

MEMORANDUM BY JENKINS, J.:             **FILED NOVEMBER 23, 2015**

_____

[*] Former Justice specially assigned to the Superior Court.

William Quattlebaum and Sheldon Hannibal appeal from their judgments of sentence for third degree murder and related offenses. We affirm.

Quattlebaum and Hannibal started a gunfight because Quattlebaum suspected that another man was dating his girlfriend. Marquis Gordon, a participant in the gunfight, was shot and killed either by Quattlebaum or Hannibal. A jury found Quattlebaum and Hannibal guilty of third degree murder, conspiracy to commit murder, carrying a firearm without a license, carrying a firearm on a public street in Philadelphia and possessing an instrument of crime.[1] The trial court sentenced Quattlebaum to an aggregate of 27-54 years' imprisonment and sentenced Hannibal to an aggregate of 30-60 years' imprisonment. Both defendants filed timely post-sentence motions, which the trial court denied, and timely notices of direct appeal. Both defendants and the trial court complied with Pa.R.A.P. 1925. Pursuant to Pa.R.A.P. 503, we consolidate both appeals.

The trial court accurately summarized the evidence as follows:[2]

In the evening of February 1, 2013, Ya-Ron Frazier was with William Quattlebaum, running various errands until the very early morning hours of February 2, 2013. Eventually, Ya-Ron and Quattlebaum parked outside Ya-Ron's sister's home on the

_____

[1] 18 Pa.C.S. §§ 2502(c), 903, 6106(a)(1), 6108, and 907(a), respectively. The jury acquitted both defendants of first degree murder.

[2] The trial court issued separate opinions for Hannibal and Quattlebaum, but the factual summary in each opinion is virtually identical.

- 2 -

5900 block of North 20th Street in Philadelphia. Quattlebaum had a firearm on his hip when he and Ya-Ron were together that day. Meanwhile, Ya-Ron's sister, Sharon Frazier, was at home while a third sister, Ashlaterra Frazier, was visiting. Ya-Ron and Quattlebaum were talking while sitting in Quattlebaum's car outside Sharon's home. While talking with Quattlebaum, Ya-Ron received a phone call from Mark Bowie, which instigated an argument between Ya-Ron and Quattlebaum about whether or not Ya-Ron was dating Bowie.

While Ya-Ron and Quattlebaum were arguing, Bowie and John Maxwell walked up the street to Sharon's home and entered. A few minutes after Bowie and Maxwell entered the home, Ya-Ron also entered, with Quattlebaum following shortly thereafter in order to continue his argument with Ya-Ron. Quattlebaum eventually left the house, remaining across the street next to his parked car.

Approximately an hour later, Bowie and Maxwell left the Frazier home, heading south on 20th Street towards Nedro Street. [Hannibal] and Quattlebaum were both present on the street when Bowie and Maxwell left. Ashlaterra, noticing a jeep with its lights off following Bowie and Maxwell, called Bowie and Maxwell back into the house. Bowie and Maxwell then made arrangements for Anthony Powell to pick them up in Powell's car. At approximately 1:15 a.m. on February 2, 2013, Bowie and Maxwell again left the home, heading north on 20th Street towards Champlost Street and cutting through a parking lot to where their ride was presumably waiting. [Hannibal] and Quattlebaum were again both present on the street when Bowie and Maxwell left the second time. [Hannibal's] sister, Lorraine Cummings, was also present on the street. As Bowie and Maxwell left, [Hannibal] followed on the far side of the street with a firearm in his waistband.

After Bowie and Maxwell entered the parking lot, Quattlebaum fired a shot in their direction. [Hannibal] then ran back towards Quattlebaum and began shooting his firearm as well. Quattlebaum and [Hannibal] then exchanged gunfire with Marquis Gordon, who [had accompanied Powell to the parking lot and who] was located at the east end of the parking lot and in possession of a 9 millimeter pistol. Gordon … shot and struck Quattlebaum's car three times, while Gordon was struck once in the chest. After the exchange of gunfire, [Hannibal's] sister,

- 3 -

Cummings, told both men to 'pick up the shells' and Quattlebaum and [Hannibal] left the area in Quattlebaum's vehicle.

Police Officer Thomas Dempsey was approximately half a block east from the shooting scene, taking a report on an automobile accident, when he heard a series of three to four gunshots from the direction of Opal Street. After hearing the shots, Officer Dempsey heard a male voice say: 'Come on, let's get out of here.' Officer Dempsey immediately called for police support and drove to Opal Street. Officer Anthony Ferriola was approximately three blocks south of the shooting scene when he too heard the gunfire. Upon arriving at the middle of the 5900 block of Opal Street, Officers Dempsey and Ferriola observed Gordon lying face down on the sidewalk with a small black handgun lying next to him. Emergency personnel arrived on the scene shortly thereafter and Gordon was rushed to the hospital where he was later pronounced dead as a result of a single gunshot wound to the chest. Police recovered four 9 mm fired bullet casings and a 9 mm gun at the scene where Gordon was found.

Later that same morning, [Quattlebaum's] wife, Shante Quattlebaum, saw bullet holes in their car and questioned defendant about how they got there. Quattlebaum stated that he did not know how the car had been shot. Quattlebaum later paid approximately $500 in cash to have the holes repaired. Ms. Quattlebaum had also seen [Quattlebaum] carrying a semi-automatic firearm around the time of the shooting. While incarcerated pending trial, [Quattlebaum] informed a cellmate, Mohamad Doumbia, that he had gotten into a 'situation' with another guy on his block, that the guy had left and come back, and that [Quattlebaum] thought the guy had a gun and shot him…

[Forensic] examination revealed the 9 millimeter bullet recovered from Gordon's body was not fired from the firearm discovered next to him. However, police officers recovered a fully loaded 9 millimeter firearm magazine from a sewer grate two houses down from Quattlebaum's residence.

Trial Court Opinion (Quattlebaum), at 2-5, 7 (citations and footnotes omitted).

Quattlebaum raises three issues in his appeal, which we have re-ordered for purposes of disposition:

1. Whether the evidence was insufficient as a matter of law to sustain [Quattlebaum's] conviction[s] for murder in the third degree, carrying a firearm without a license, and possession of [an] instrument of crime?

2. Whether the verdict was against the weight of the evidence?

3. Whether [Quattlebaum's] sentence was manifestly excessive and imposed in violation of law?

Brief for Quattlebaum, at 6.

Hannibal raises four issues in his appeal:

1. Did the [trial court] err in not giving a charge of self-defense or a mistaken belief of self-defense instruction on behalf of [] Hannibal, particularly when the evidence demonstrated that [] Hannibal acted in self-defense since the victim was firing shots in the vicinity of [] Hannibal? Did [the trial court] err, particularly since [it] gave a charge of self-defense for the co-defendant? Did the failure to charge on self-defense or mistaken belief of self-defense deny [] Hannibal his right to due process and a fair trial?

2. Did [the trial court] err in not granting a mistrial when he allowed the witness, Ya-Ron Frazier, to testify that she received a threatening call in the morning of her trial testimony on April 23, 2014 when there was no evidence that [] Hannibal was involved with such a call? Did such testimony unfairly taint [] Hannibal, particularly since there was no evidence he was involved with this alleged threat? Was the limiting instruction of the [trial court] not enough to cure this improper testimony?

3. Did the Assistant District Attorney, in his closing speech, make improper and inflammatory statements and statements of personal opinion and did the remarks prejudice the jury so it was unable to render a fair verdict? Further, did [the trial court] err in allowing the District Attorney to criticize the defense argument suggesting this was an ambush since the District Attorney knew from [] Powell, a witness who could not be found, that the victim and others came over armed for the purpose of a confrontation?

- 5 -

4. Were the verdicts for murder of the third degree, conspiracy to commit murder of the third degree, carrying firearms without a license, carrying a firearm on a public street and possessing an instrument of crime against the weight of the evidence? Did the evidence demonstrate that gunshots were being fired at [] Hannibal, and that [] Hannibal acted in self-defense? Was the evidence conflicting and speculative? Should this verdict shock the conscience of the fact finder?

Brief for Hannibal, at 5-7.

We first address Quattlebaum's arguments. Quattlebaum contends that the evidence was insufficient to sustain his convictions for third degree murder, carrying a firearm without a license and possession of an instrument of crime. Quattlebaum has waived his challenge to the sufficiency of the evidence underlying his convictions for carrying a firearm without a license and possession of an instrument of crime, because he failed to develop any argument concerning these offenses in his brief. *See* Pa.R.A.P. 2119(a); *Commonwealth v. Spotz*, 18 A.3d 244, 282 (Pa.2011). Quattlebaum also waived his sufficiency challenge to his conviction for third degree murder by presenting only a boilerplate generic challenge to the sufficiency of the evidence in his Pa.R.A.P. 1925(b) statement. *See Commonwealth v. Williams*, 959 A.2d 1252, 1256-57 (Pa.Super.2008) (challenge to sufficiency of the evidence was waived because defendant, in statement of errors complained of on appeal, failed to allege specific elements of any crime which evidence failed to sufficiently establish).

Even if Quattlebaum had preserved his sufficiency challenges for appeal, they are devoid of merit. Our standard of review for challenges to the sufficiency of the evidence is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa.Super.2015).

A person is guilty of criminal homicide if he "intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. §2501(a). To prove murder in the third degree, the Commonwealth must prove that the defendant acted with malice, i.e., a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty..." *Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa.Super.2011). Malice exists where the defendant evidences a conscious disregard of an "unjustified and extremely high risk" that his actions might cause serious bodily injury or death. *Id*. Malice can be inferred from the use of a deadly weapon on a vital part of the body. *Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa.2013).

A person is guilty of an offense as a conspirator where he: intends to commit or aid in the commission of the criminal act; enters into an agreement with another to engage in the crime; and he or his conspirator commits an overt act in furtherance of the agreed-upon crime. 18 Pa.C.S. §903; *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008). Each member of a conspiracy to commit third degree murder is guilty for the acts of his cohorts. *Commonwealth v. Bigelow*, 611 A.2d 301, 304 (Pa.Super.1992) ("Bigelow's undisputed participation in the conspiracy which resulted in Davis' death supports Bigelow's conviction of third degree murder"). A conspirator is guilty of murder even where he does not inflict the fatal wound.[3] *Montalvo*, 956 A.2d at 932.

The evidence of record shows that Quattlebaum was armed on the night of the murder; Quattlebaum suspected his paramour, Ya-Ron Frazier, of having an affair; Quattlebaum and Hannibal staked out Ya-Ron's house; Quattlebaum fired at two men who were leaving Ya-Ron's house, resulting in a gun battle in which Quattlebaum and Hannibal shot at the victim, Gordon; one of their shots killed Gordon; Quattlebaum fled the scene after the shooting; Quattlebaum lied about the reason for three bullet holes in his car; Quattlebaum admitted to a jailhouse cellmate that he had gotten into a "situation" and shot someone on his block; and the magazine from a 9-

---

[3] Furthermore, conspiracy to commit third degree murder is a cognizable offense. *Commonwealth v. Fisher*, 80 A.3d 1186, 1195 (Pa.2013).

millimeter weapon, the kind used to kill Gordon, was found in a sewer grate two houses from his.[4] This evidence was sufficient to sustain Quattlebaum's conviction of murder of the third degree, either as the shooter or as Hannibal's co-conspirator to shoot Gordon. *See Commonwealth v. Marquez*, 980 A.2d 145, 149-50 (Pa.Super.2008) (evidence supported finding that defendant acted with malice when defendant's brother shot victim, thus supporting conviction for third-degree murder; defendant sought out victim, whom defendant apparently believed to be one who burglarized apartment that defendant shared with brother, defendant called someone on cell phone to let him know "he is here," and defendant held victim in headlock until brother arrived and shot him; defendant's flight to Florida after murder demonstrates consciousness of guilt and desire to escape prosecution for role in murder); *see also Commonwealth v. Truong*, 36 A.3d 592, 600 (Pa.Super.2012) (attempt to dispose of murder weapon constitutes evidence of consciousness of guilt).

With exceptions not relevant here, a person is guilty of carrying firearms without a license under 18 Pa.C.S. § 6106(a)(1) if he "carries a firearm in any vehicle or … carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license." Further, a person is guilty of possession of

---

[4] We incorporate by reference the numerous citations to the trial transcript in the trial court's opinion.

an instrument of crime "if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). The evidence summarized above – particularly the fact that Quattlebaum shot at Gordon and admitted the shooting to a jailhouse cellmate -- was sufficient to sustain his convictions for carrying firearms without a license and possession of an instrument of crime.

Next, Quattlebaum contends that the verdict was against the weight of the evidence. The law pertaining to weight of the evidence claims is well-settled. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1273–74 (Pa.Super.2005). A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa.Super.2007). The role of the trial judge is to determine whether, notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.* On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is

against the weight of the evidence." **Commonwealth v. Knox**, 50 A.3d 732, 738 (Pa.Super.2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. **Forbes**, 867 A.2d at 1273–74.

Quattlebaum insists that the verdict of third degree murder was against the weight of the evidence because he did not have the requisite *mens rea* for this crime (malice). At most, Quattlebaum argues, he was guilty of voluntary manslaughter, because he acted in "imperfect self-defense," i.e., he held an unreasonable rather than reasonable belief that deadly force was necessary to save his life. **See Commonwealth v. Bracey**, 795 A.2d 935, 947 (Pa.2001) (defining imperfect self-defense). The trial court fully and satisfactorily explains why Quattlebaum's weight of the evidence claim is unsuccessful:

> [T]he Commonwealth offered compelling evidence to refute [Quattlebaum's] self–defense claim as to the third-degree murder of Marquis Gordon. Each of the Frazier sisters testified, either at trial or before the grand jury, that [Quattlebaum] fired the first shot that morning. Ashlaterra, in particular, testified that she heard the first gunshot that was fired and saw the spark from that gunshot coming from the place where [Quattlebaum] was alone, in the middle of the street, holding a gun. This compelling evidence established that [Quattlebaum] started the gunfight, and provoked return fire from the decedent. The jury was free to accept that evidence and conclude that, as a result, [Quattlebaum's] killing of Gordon was not justified under the law of self-defense. Moreover, [Quattlebaum's] culpability as the first shooter was corroborated by his behavior after the shooting, which included fleeing the scene, disposing of his gun, and lying

- 11 -

to his wife about how bullet holes wound up in his car. [Thus,] the evidence refuted [Quattlebaum's] self-defense claims and fully supported the verdicts…[5]

Trial Court Opinion (Quattlebaum), at 10 (citations omitted). Having carefully reviewed the record, we conclude that the trial court properly exercised its discretion in denying Quattlebaum's challenge to the weight of the evidence for the reasons given in its opinion.

In his final argument, Quattlebaum contends that the trial court imposed an unconstitutional mandatory minimum sentence under **Alleyne v. United States**, -- U.S. --, 133 S.Ct. 2151 (2013), and that his sentence is excessive because the trial court failed to consider mitigating factors, particularly his remorse. Neither point has merit.

**Alleyne** held that "facts that increase mandatory minimum sentences must be submitted to a jury" and must be found "beyond a reasonable doubt." **Id**., 113 S.Ct. at 2163. Quattlebaum's sentencing order, however, states explicitly that his sentence is not a mandatory minimum sentence. Thus, **Alleyne** is inapposite.

Quattlebaum's claim that the trial court failed to consider mitigating factors is a challenge to the discretionary aspects of his sentence. Challenges to the discretionary aspects of sentencing do not entitle a

_____

[5] The trial court gave a self-defense instruction to the jury concerning Quattlebaum. As discussed below, however, the trial court properly refused to give a self-defense instruction concerning Hannibal.

petitioner to review as of right. ***Commonwealth v. Allen***, 24 A.3d 1058, 1064 (Pa.Super.2011). Before this Court can address such a discretionary challenge, an appellant must comply with the following requirements:

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Id.*** Presently, Quattlebaum failed to claim at sentencing or in his post-sentence motions that the trial court failed to consider his rehabilitative needs. Thus, he has waived this argument. Even if he had preserved it, it is devoid of merit, because the trial court actually took into account his expression of remorse at sentencing and reduced his sentence because he had done good things for many people. N.T., 7/7/14, at 82 (court's statement that "[t]his is a significant sentence. It's a lower sentence than I would ordinarily give under these circumstances and the reason for that are the good things that were brought to my attention").

We now address Hannibal's arguments. First, Hannibal contends that the trial court erred in refusing to instruct the jury on self-defense or imperfect self-defense. Although Hannibal raised the lack of a self-defense instruction in his Pa.R.A.P. 1925(b) statement, he omitted any objection to the lack of an imperfect self-defense instruction. As a result, the trial court did not address the lack of an imperfect self-defense instruction in its

opinion. Accordingly, Hannibal has waived his objection to the lack of an imperfect self-defense instruction.[6] **See Commonwealth v. Mattison**, 82 A.3d 386, 393 (Pa.2013).

Turning to the lack of a self-defense instruction, our standard of review in reviewing a jury charge is to determine

> whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. **Commonwealth v. Brown**, 911 A.2d 576, 582-83 (Pa.Super.2006). In so doing, we must view the charge as a whole, recognizing that the trial court is free to use its own form of expression in creating the charge. **Commonwealth v. Hamilton**, 766 A.2d 874, 878 (Pa.Super.2001). '[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations.' **Id.** It is well-settled that the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

**Commonwealth v. Scott**, 73 A.3d 599, 602 (Pa.Super.2013).

During trial, Ya-Ron Frazier, a Commonwealth witness, testified that she saw Hannibal with a gun at the time of the shooting. N.T., 4/23/14, at 117. The Commonwealth introduced Ya-Ron's prior statement to police that Hannibal fired his gun into a parking lot. **Id**. at 165. Ashlaterra Frazier,

_____

[6] We note that trial courts normally give an imperfect self-defense instruction when charging juries on voluntary manslaughter. Here, however, the trial court declined to charge the jury on voluntary manslaughter with regard to Hannibal. N.T., 4/28/14, at 184, 212.

another Commonwealth witness, testified that she saw Hannibal with a gun and saw him fire the gun toward the parking lot. N.T., 4/24/14, at 148, 214. In addition, the Commonwealth introduced the following statement that Hannibal gave following his arrest:

> I was out there on the block for a little bit and shit started to happen. I heard gunshots and I took off running for my house. I was just trying to get in the door and I fired one shot toward where I hearing the shots coming from. I went in the house and stayed in the rest of the night. I was watching the news later and found out someone got shot and killed. I left after that and my mom told me detectives came to the house. I was then staying on the streets for a while, but we didn't have nowhere else to go, so I came back to my mom's to stay and everything was fine until the morning until the cops came for me today.

N.T., 4/25/14, at 22. Hannibal also told the detective that he heard eight shots. *Id*. at 23.

Hannibal did not testify at trial, but he presented three witnesses who testified that he *did not have a gun* at the time of the shooting. N.T., 4/25/14, at 161, 168 (Michele Wall), 184-85 (Darren Ward), 201 (Sandra Hannibal).

Defense counsel asked for both a charge that mere presence at the scene of a crime is insufficient to prove guilt and a self-defense charge. Counsel argued that while he intended to argue to the jury that Hannibal merely was present at the scene of the shooting, Hannibal also was entitled to a self-defense charge based on his statement to police and the testimony of Commonwealth witnesses that he possessed and fired a gun.

The trial court properly declined to give a self-defense instruction concerning Hannibal. We recognize that a self-defense claim "may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination." *Commonwealth v. Mayfield*, 585 A.2d 1069, 1070-71 (Pa.Super.1991) (*en banc*). Normally, the court should charge the jury on the elements of self-defense where the defense is supported by any evidence in the record. *Commonwealth v. Hamilton*, 766 A.2d 874, 880 (Pa.Super.2001). A defendant cannot obtain a self-defense instruction, however, when he presents evidence inconsistent with a claim of self-defense. As we explained in *Mayfield*:

> Appellant herein would argue, as a general proposition, that even when a defendant denies the use of deadly force, if there is any evidence from whatever source that a defendant utilized the deadly force then an instruction is required. Although we agree with appellant that a defendant's testimony need not be wholly consistent with that of the Commonwealth's witnesses, and that the defendant need not present his own evidence, but rather may rely solely on the Commonwealth's evidence as presenting a claim of justification, we do not agree that a defendant may negate an element of the defense and still avail himself of a beneficial instruction thereon. While there can be no evidentiary burden on a defendant to prove a claim of self-defense … the defendant also may not provide testimony or evidence inconsistent with such a claim and still avail himself of the defense…
>
> It is the specific denial of the use of deadly force for one's own protection which precludes the claim of self-defense being put in issue. To hold otherwise, has the possibility for absurd results. For instance, a defendant could request that the jury consider

self-defense while at the same time claiming a defense of mistaken identity or alibi.

*Id.* at 1073-74. Thus, "where a defendant denies the act of using deadly force in defense of himself, he has negated one of the elements of self-defense; therefore, he may not avail himself of an instruction on justification even though evidence from other sources would be sufficient to put the claim in issue." *Id*. at 1075.

Hannibal denied using deadly force in defense of himself, thereby "negat[ing] one of the elements of self-defense," by presenting three witnesses who testified that he did not have a gun at the time of the shooting. *Mayfield*, 585 A.2d at 1075. Consequently, he was not entitled to a self-defense instruction even though his statement to police might have been sufficient to put self-defense in issue. *Id*. It would have been an "absurd result" for Hannibal to obtain a self-defense instruction in view of his presentation of evidence that he did not have a gun at the time of the shooting – testimony patently inconsistent with a claim of self-defense. *Id*. at 1073-74.

In his second argument, Hannibal contends that the trial court abused its discretion by admitting evidence that Ya-Ron Frazier received a death threat on the day she testified at trial.

The admissibility of evidence is within the sound discretion of the trial court, and we will not disturb an evidentiary ruling absent an abuse of that discretion. *Commonwealth v. Flor,* 998 A.2d 606, 623 (Pa.2010). "An

abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Commonwealth v. Harris***, 884 A.2d 920, 924 (Pa.Super.2005).

Prior to trial, Ya-Ron testified before a grand jury that the first shots she heard came from Quattlebaum's direction. During trial, shortly before Ya-Ron testified, the Commonwealth advised the trial court that Ya-Ron's family member had received a phone call threatening to kill the Frazier sisters if they came to court. N.T., 4/23/14, at 54. The court ruled that evidence of the threat would be admissible only if Ya-Ron changed her testimony, and only then to explain her behavior and assist the jury in assessing her credibility, not to show either defendant's consciousness of guilt. ***Id***. at 58-59. Hannibal's counsel stated that he was concerned that the jury might connect Hannibal to the threat, and the court said it would give a limiting instruction. ***Id***. at 60.

During her trial testimony, Ya-Ron Frazier contradicted her grand jury testimony by claiming that the first shots she heard came not from Quattlebaum's direction but from where Gordon was. N.T. 4/23/14, 116, 162-63, 165. In keeping with its ruling, the trial court permitted the prosecution to elicit that a call had been made that day threatening harm to the Frazier sisters. ***Id***. at 126. Following testimony about the threat, the

trial court directed the jury to use this evidence for the limited purpose of assessing Ya-Ron's believability in court. *Id*. at 127. The court specifically charged the jury that there was "no evidence whatsoever that these threats were caused by either of these two defendants, so I'm instructing you that you may not draw any inference of consciousness of guilt on the part of the defendants because I'm admitting this evidence." *Id*. at 128. The court repeated that the only purpose to which the jury could put the evidence was to evaluate the credibility of what the witness said that day and on prior occasions. *Id*.

The court acted within its discretion in admitting Ya-Ron's testimony about the threat. *See Commonwealth v. Bryant*, 462 A.2d 785, 788 (Pa.Super.1983) (threats by third person admissible when offered not to prove defendant's guilt but to reconcile inconsistencies between witness's pre-trial statement and trial testimony); *see also Melehan v. Florida*, 126 So.3d 1118, 1128 (Fla.Dist.Ct.App. 2012) (third party threats to trial witness admissible to explain witness's recantation of pre-trial statements). Moreover, the trial court safeguarded Hannibal by cautioning the jury to use the threat only in gauging Ya-Ron's credibility and not as evidence of Hannibal's guilt.

In his third argument, Hannibal asserts that the trial court abused its discretion in denying his motions for mistrial on the basis of multiple instances of prosecutorial misconduct. We review such claims for abuse of

discretion. ***Commonwealth v. Caldwell***, 117 A.3d 763, 774 (Pa.Super.2015) (*en banc*). The relevant inquiry is whether the alleged prosecutorial misconduct deprived the defendant of a fair trial; he is not entitled to a perfect trial. ***Commonwealth v. Judy***, 978 A.2d 1015, 1019 (Pa.Super.2009).

A prosecutor is free to present arguments with logical force and vigor. ***Commonwealth v. Johnson***, 668 A.2d 97, 105-06 (Pa.1995). A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair. ***Commonwealth v. Marshall***, 633 A.2d 1100, 1107 (Pa.1993). "A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." ***Commonwealth v. Brown***, 911 A.2d 576, 580 (Pa.Super.2006). A prosecutor

> may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made.

***Commonwealth v. Burno***, 94 A.3d 956, 974 (Pa.2014).

> While it is improper for a prosecutor to offer any personal opinion as to the guilt of the defendant or the credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt.

***Id***.

Even where language may be improper, a new trial is necessary only where "the prosecutor's challenged comments had the unavoidable effect of prejudicing the jury with such animus toward the defendant as to render it incapable of fairly weighing the evidence and arriving at a just verdict." *Commonwealth v. Carson*, 913 A.2d 220, 236 (Pa.2006). Furthermore, "a trial court may remove taint through curative instructions … Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required." *Caldwell*, 117 A.3d at 774.

During closing argument in the present case, the prosecutor attempted to explain discrepancies between Ya-Ron Frazier's grand jury testimony and her trial testimony as follows:

> When someone is too scared they cannot or will not do the talking, their statements, their prior testimony under oath does the talking for them. The judge will instruct you on that. And that makes perfect sense, because why? Because it's easier when you have to live in the Champlost homes and you have to go back there, it's easier to talk about what happened when you're in the safety of the Homicide Division. It's easier to talk about and be truthful when you're at an indicting grand jury, a secret proceeding. It's way different than having your house broken into and ransacked. It's different than when you have to stare down to murderers in the face.

N.T., 4/28/14, at 105. Hannibal's attorney objected and moved for a mistrial. The trial court instructed the jury to disregard the statement and said it was the jury's decision as to what the evidence shows.

Hannibal insists that the court should have granted a mistrial because the prosecutor ventured his own personal opinion that the defendants were "murderers". We disagree. The prosecutor's remark was a fair and vigorous summary of the evidence presented, particularly the evidence that (1) Ya-Ron Frazier changed her trial testimony from her grand jury testimony because of the threatening phone call on the morning of her trial testimony; (2) both defendants shot at Gordon; and (3) one of their shots killed Gordon. In view of this evidence, the prosecutor properly argued that Ya-Ron had good reason to be fearful in the defendants' presence. *See Burno*, 94 A.3d at 975 (prosecutor did not offer personal opinion by saying, when arguing that accused shot victim, "I know that. Fact"; remark was "permissible appeal to the jury to make a logical inference from the evidence adduced at trial" and also was "fair comment" made with "oratorical flair"). The prosecutor's remark was also a fair response to the closing argument of Quattlebaum's attorney, who suggested to the jury that Ya-Ron Frazier lied during trial by recanting her grand jury testimony. N.T., 4/28/14, at 52; *cf. Carson*, 913 A.2d at 238 (prosecutor's comment during closing argument of guilt phase of capital murder trial, "well, if I were that type of a guy, you would probably see about ten eyewitnesses up there all having been paid in full," was fair response to defense counsel's argument that prosecutor would "do anything and say anything in order to engineer a guilty verdict in a

case," a largely improper and baseless implication that prosecutor would behave unethically, or indeed criminally, to win cases).

Hannibal further argues that the prosecutor offered his own opinion that another Commonwealth witness, Ashlaterra Frazier, was telling the truth. The prosecutor stated: "The witness I want to start with is Ms. Ashlaterra Frazier. Now, she was scared, she didn't want to be here. She actively avoided corning to court. You heard the judge had to issue a bench warrant for her arrest just to get her into court, but once she was here, she told the truth." N.T., 4/28/14, at 107. Hannibal's attorney moved for a mistrial. The court denied a mistrial but instructed: "You need to argue what the evidence shows. The prosecutor's own opinion doesn't matter. What he's arguing to you is what the evidence shows." *Id*. The prosecutor's remark was a fair summary of Ashlaterra Frazier's testimony instead of his own personal opinion. *See Bruno*, 94 A.3d 975. Even assuming that the prosecutor's remark was improper, the trial court cured any possible taint with his curative instruction that the "prosecutor's own opinion doesn't matter," and the only thing that was important was the evidence itself. *See Caldwell*, 117 A.3d at 774; *see also Commonwealth v. Chmiel*, 80 A.3d 415, 445 (Pa.2013) (jury is presumed to follow court's instructions).

Next, Hannibal argues that the prosecutor overstepped his bounds by mentioning a telephone conversation in which Quattlebaum indicated that Hannibal was "ratting".

- 23 -

To place this remark in context, Quattlebaum's attorney claimed in his closing argument that Quattlebaum acted in self-defense. In response, the prosecutor argued that after Quattlebaum's arrest, he stated during a telephone conversation that Hannibal was "rattin'", a comment that demonstrated Quattlebaum's consciousness of his own guilt. Specifically, the prosecutor stated:

> Within 48 hours [after Quattlebaum's arrest, Quattlebaum's] on the telephone with a male and he says – some talk with this other woman about getting on the phone. Finally this man gets on the phone and the first words without a question, without a prompt, without any conversation, he says, 'Young[7] is rattin.' 'Young is rattin.' Well, let's do the math. Twenty-nine, 23. So we know who Young is. We know Young gave a statement. Young tried to tell us what he was doing out there that night. What does [Quattlebaum] say? 'Young is rattin.' His words.

N.T., 4/28/14, at 134. Hannibal's attorney moved for a mistrial, and the court gave the following limiting instruction:

> What [] Quattlebaum said is admissible and you may consider it in the case against [] Quattlebaum and I do instruct you not to consider it with regard to [] Hannibal. But remember a statement that a defendant makes is only admissible against that defendant. What the prosecutor is referring to is the statement that he contends the evidence shows came from [] Quattlebaum.

N.T., 4/28/14, at 134-35. The trial court properly denied Hannibal a mistrial. The prosecutor's comment was a fair response to Quattlebaum's

_____

[7] "Young" apparently refers to Hannibal, as the trial court indicated moments later in a limiting instruction to the jury. N.T., 4/28/14, at 134-35. Hannibal does not dispute that "Young" is a reference to Hannibal.

argument that he acted in self-defense: Quattlebaum's concern that Hannibal was "rattin", i.e., confessing, showed that Quattlebaum knew he was guilty of murder and did not act in self-defense. *Commonwealth v. Hughes*, 865 A.2d 761, 792 (Pa.2004) (conduct of accused following crime, including manifestations of mental distress, is admissible as tending to show guilt). Moreover, the court's limiting instruction ensured that the jury did not treat Quattlebaum's statement as admissible against Hannibal. *See Caldwell*, 117 A.3d at 774.

Next, Hannibal argues that the prosecutor improperly appealed to the sympathy of the jury by stating the following:

> And so when the time comes, all I ask you to do is to uphold your oath, to reach down inside and to stand up, stand up for what is right, stand up for what is just, stand up for Marquise Gordon, an 18-year-old boy who will never get to stand up or speak for himself. Stand up for the family that will never get to hold or touch or speak to that young man ever again.

N.T., 4/28/14, at 145. Hannibal moved for a mistrial. The court denied a mistrial but cautioned the jury: "What you need to do is determine what the evidence shows, and an appeal to your sympathy is not appropriate." *Id*. at 145. We agree with the trial court that this instruction removed the possibility of any prejudice to Hannibal. *See Caldwell*, 117 A.3d at 774.

Finally, Hannibal contends that the prosecutor falsely argued that Gordon did not "ambush" Quattlebaum and Hannibal. The prosecutor made this argument in fair response to Hannibal's counsel's proclamation that Powell and Gordon "ambushed" Quattlebaum and Hannibal. N.T., 4/28/14,

- 25 -

at 95. Moreover, Hannibal fails to establish that the prosecutor said anything false or misleading to the jury.

The relevant background is as follows: Ya-Ron Frazier testified at trial that when Bowie and Maxwell were inside Sharon Frazier's house on the night of the shooting, they telephoned Anthony Powell and told Powell to pick them up in the parking lot. N.T., 4/23/14, at 107, 205-07. Ya-Ron learned from this telephone conversation that Powell was bringing another person along with him, but she did not know the other person's identity. *Id*. at 205-07. The other person turned out to be Gordon. Powell gave a statement to police detectives after the shooting, N.T., 4/25/14, at 135-36, but Powell did not testify at trial, because neither police detectives nor Hannibal's investigators could locate him. N.T., 4/28/14, at 149-50. Thus, as Hannibal's attorney acknowledged, Powell's statement was inadmissible hearsay. N.T., 4/25/14, at 133-37.

During closing argument, Hannibal's counsel claimed that Powell and Gordon had plotted to ambush Quattlebaum in the parking lot: "Mr. Powell, why would he be hiding, it was his friend in there, the car? Why would they be hiding? Why aren't they here? Because they ambushed, they had an ambush, they had a plan." N.T., 4/28/14, at 95. In response, the prosecutor stated:

> I just want to take one second, let's talk about this whole idea this is some sort of ambush. Can we talk about that for a moment? The whole idea that it's an ambush that Marquise Gordon, who doesn't know anyone, anyone, who doesn't know

- 26 -

any of the parties, somehow decided that he was going to show up and walk through a brightly lit parking lot that you saw pictures of for days, stand 45 yards away and start shooting a man he never met, that's the evidence. And then they get up here today and now they want you to conjecture and conspire and try to speculate and try to create something that simply isn't there.

*Id*. at 136. Hannibal moved for a mistrial, and the court overruled his objection. *Id*. at 137.

It was understandable for Hannibal's counsel to argue that Powell and Gordon plotted an ambush, because this theoretically explains why Gordon brought a gun to the parking lot. It was reasonable for the prosecutor to counter, however, that the "ambush" theory was baseless, since there was no evidence that Gordon knew anyone besides Powell or had any motive to enter any plot with Powell. Simply stated, the prosecutor's argument was a fair response to Hannibal's "ambush" claim.

Hannibal implies in his appellate brief that the prosecutor knew that Powell told police that Gordon conspired with Bowie, Maxwell and/or Powell to start a gunfight, yet the prosecutor lied to the jury that there was no conspiracy. Hannibal writes:

What is particularly upsetting is the prosecution knew that [Bowie and Maxwell] had telephoned [] Powell to come to pick them up with reinforcement. [] Powell's statements to homicide detectives indicated he brought [] Gordon, the decedent, down and dropped him off. It was clear [] Gordon was with the group called by [Bowie and Maxwell] and had a gun. For the prosecutor to argue that [] Gordon had no knowledge and there was no connection of [] Gordon to what happened, is just wrong. The prosecutor knew from his own discovery that was false. The only reason the defense couldn't present this evidence was no

- 27 -

one could find [] Powell. The incorrect statement by the prosecutor by itself should warrant a new trial … [Hannibal's counsel] had raised th[is] issue and had tried to cross-examine Detective Graf on Powell's involvement during the trial, but was barred by the judge and District Attorney. The detective agreed that Powell had useful information.

Brief For Hannibal, at 56-57 (emphasis added). These accusations are groundless. Powell's statement was inadmissible hearsay because he was unavailable to testify.[8] The prosecutor had no duty to tailor his closing argument in deference to inadmissible and unreliable[9] hearsay. His only duty was to make a responsible argument supported by facts admitted into evidence. That is exactly what he did. He argued that Gordon was not involved in any plot but was simply in the wrong place at the wrong time – a logical position for the prosecutor to take in view of the admitted evidence. We reject Hannibal's attempt to portray the prosecutor's argument as a nefarious ploy to conceal the truth from the jury.

The final strand in this argument is Hannibal's claim that he deserves a new trial due to the cumulative effect of the prosecutor's misstatements. We disagree, because as we explained above, each of the prosecutor's statements was permissible and/or non-prejudicial.

---

[8] Hannibal does not allege that the prosecutor or police prevented Powell from testifying to keep his statement out of evidence.

[9] *Commonwealth v. Green*, 76 A.3d 575, 582 n. 1 (Pa.Super.2013) ("hearsay is inherently unreliable, and its admission risks substantial prejudice to the party against whom the statement is being offered").

In his fourth and final argument, Hannibal contends that he should receive a new trial because the weight of the evidence demonstrates that he acted in self-defense. This argument fails for the same reason as Quattlebaum's challenge to the weight of the evidence that we addressed on pages 9-11 above – specifically, there was plentiful evidence from which the jury could conclude that Hannibal and Quattlebaum initiated the gunfight instead of acting in self-defense. Moreover, since Hannibal's defense at trial was that he did not have a gun, it is disingenuous for him to argue self-defense on appeal.

Judgments of sentence at 3116 EDA 2014 and 3279 EDA 2014 affirmed.

Judge Mundy joins in the memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/23/2015